Filed 9/12/13  In re Z.R. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Z.R., a Person Coming Under the Juvenile Court Law. | |
| DEL NORTE COUNTY DEPARTMENT OF HEALTH AND SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>B.R. et al.,<br><br>        Defendants and Appellants. | A135645, A136929<br><br>(Del Norte County<br>Super. Ct. Nos. JVSQ12-6041, JVSQ12-6042, JVSQ12-6043, JVSQ12-6044, JVSQ12-6045, JVSQ12-6046, JVSQ12-6047, JVSQ12-6048, JVSQ12-6049) |

Appellants J.R. (mother) and B.R. (father) challenge jurisdictional and dispositional orders as to their nine children.  Their sole argument is that the orders should be reversed because of a failure to comply with the notice provisions of the Indian Child Welfare Act of 1979 (25 U.S.C.A. § 1901 et seq.) (ICWA).  We disagree and affirm.

I.

PROCEDURAL AND FACTUAL
BACKGROUND

This case began when respondent Del Norte County Department of Health and Human Services (Department) filed nine separate juvenile dependency petitions in

1

March 2012[1] alleging that mother and father had abused their nine children. In jurisdictional orders, the juvenile court concluded that all nine minors were children described by Welfare and Institutions Code section 300.[2] Father filed a premature appeal from these orders (A135645). Following a dispositional hearing, the juvenile court adjudged the minors to be dependent children, ordered that they remain out of their parents' physical custody, and ordered family reunification services. Both mother and father filed a timely appeal from the dispositional orders (A136929), which we resolve in this opinion.[3]

While these appeals were pending, further proceedings ensued. At the conclusion of a contested six-month review hearing, the juvenile court terminated reunification services and set a selection-and-implementation hearing. Mother petitioned for extraordinary writ review of this order, which we denied. (*J.R. v. Superior Court* (May 8, 2013, A137755) [nonpub. opn.].) In our opinion denying the petition, we summarized the reasons for the Department's involvement in this case, which we need not repeat here except to say that they involved allegations of incest and molestation. After we denied the petition, the juvenile court terminated mother's and father's parental rights. Both parents timely appealed from that order and that separate appeal remains pending. (A139174.)

In this opinion, our discussion of the proceedings below is limited to the sole issue raised: whether the Department complied with ICWA's notification provisions. Early in the proceedings, mother notified the juvenile court that she might have Native American

---

[1] All further date references are to the 2012 calendar year.

[2] All statutory references are to the Welfare and Institutions Code.

[3] Although mother did not join father in filing an appeal from the jurisdictional orders (A135645), she was appointed appellate counsel, who candidly acknowledged in motions filed in this court that jurisdictional orders are nonappealable. Mother and father requested extensions of time so that appeals could be filed from the dispositional orders before they filed appellate briefs. After these appeals were filed (A136929), this court granted mother's request to consolidate them with the appeal from the jurisdictional orders. We now dismiss father's appeal from the jurisdictional orders because we lack jurisdiction over it. (*In re Javier G.* (2005) 130 Cal.App.4th 1195, 1200-1201.)

2

ancestry.  When the court questioned mother about it at the detention hearing on March 2, mother responded, "It's questionable on my mom's side."  Mother explained that she did not have any information about a particular tribe, and she had no way to contact her mother (the maternal grandmother), who was "supposedly deceased, but possibly still alive, but in the records she's deceased."  The juvenile court directed mother to complete a form used to assist with the investigation of whether a child in a dependency proceeding may be an Indian child (ICWA-020), and mother filed one later that day.  On the ICWA-020, two boxes are checked:  one states, "I have no Indian ancestry as far as I know," and the other states, "I may have Indian ancestry."  Handwritten notes indicate that the names of possible tribes or bands were "UNKNOWN."  The same form was filed in all nine cases.  About two weeks later, the Department filed jurisdiction reports stating that ICWA did not apply.  In disposition reports filed on June 7, the Department again asserted that ICWA did not apply.

At a hearing on June 15, father's counsel stated that on her way to court she was "given paperwork that indicates that the mother's grandfather is full-blooded Cherokee." The juvenile court questioned mother about this, and mother reported that she had learned from talking with her sister and stepgrandmother as well as doing internet research that her maternal "grandpa [O.R.] is in the Cherokee tribe, and I can't find out my grandma [I.R.]'s maiden name, but she is possibly also and my dad is a quarter from his dad."  She stated that O.R. was from "Marysville or whatever, California.  And he's—he's on the roll."  Father's counsel stated that she (the attorney) had "a roll number, identification number" as well as a birth certificate to help the Department track down information. The juvenile court vacated a scheduled disposition hearing so that the Department could investigate possible Native American heritage.

Later that day, mother filed an additional ICWA-020, stating that she might have Indian ancestry through the Cherokee tribe.  A few days later, father's counsel filed three documents regarding mother's possible Native American lineage.  One was mother's birth certificate.  The second contained handwritten notes about mother's relatives, including her father's name and the fact he was "quarter Cherokee," her grandmother's

3

married name, the date of her mother's "supposed death," and a comment that her maternal grandfather was "full blooded Cherokee." The third listed various Cherokee roll numbers, including one for someone with the name of mother's grandfather.

On June 29, the Department filed a judicial council form used to notify tribes that a child in a dependency proceeding may be an Indian child (ICWA-030), along with a list of more than 50 tribes to which notice had been mailed.[4] Notice also was sent to the Bureau of Indian Affairs (BIA). Consistent with information provided by mother and father, the form identified possible eligibility for membership in the Cherokee tribe, and the Department mailed notice to the three Cherokee tribes listed in the then-current version of the Federal Register. (76 Fed.Reg. 30438, 30461 (May 25, 2011).)

For reasons that elude us, the ICWA-030 was also sent to dozens of Paiute and Pomo tribes listed in the Federal Register. (76 Fed.Reg. 30438, 30461, 30469-30472 (May 25, 2011).) On appeal, the parties shed no light on why notice was sent to these tribes. The Department states in its brief that "[t]he record is devoid of information concerning why the Paiute and Pomo tribes were noticed," and mother did not file a reply brief.

On July 10, the Department filed return receipts from various tribes that had received the ICWA-030 notice. That same day, a contested jurisdiction hearing began on supplemental petitions filed as to seven of the nine children. The juvenile court sustained the petitions. County counsel requested the court to schedule the disposition hearing for the following month, in part to allow time to receive responses to all ICWA notices. The disposition hearing was then scheduled for August 24.

Over the next month, the Department filed letters from various tribal representatives, all reporting that the minors were not members of, or eligible for membership in, the tribes. The Department reported in its disposition report filed on August 29 that the Department was still awaiting responses from 20 tribes.

---

[4] The relevant tribes were notified regarding all nine children, and proof of notice was filed in all nine proceedings, a significant undertaking for the Department.

4

After a continuance because of scheduling issues, the disposition hearing began on August 31, and the juvenile court inquired about the status of ICWA notification. Mother's counsel stated that mother had informed her that day that "the wrong tribes are being notified. She's saying—she's telling me it's a different tribe." The following exchange then took place:

"[County counsel]: Well, there were notices sent to 52 tribes.

"[Mother's counsel]: She's saying she went through that list. She's telling me that it's a different tribe, not the ones on the list.

"THE COURT: Which tribe?

"[Mother's counsel]: Tell the court which tribe.

"[Mother]: They are in Oklahoma and Texas, all the—the eastern states.

"THE COURT: Well, which specific tribes are you saying should have been given notice?

"[Mother]: The only reason why I said that was because last time they were only doing California. We're not from California."

After more prodding from her attorney, mother stated that the Department should have notified "Blackfoot." The court then stated that "what I'd like is for the mother to sit down with a representative of the department who is responsible for giving notice. I'd like her attorney to be involved in that conversation as well as [county counsel] and see [if there are] any other tribes that she feels need—that should have been addressed. [¶] And if it turns out that there really [are] such tribes, then you need to be looking at getting an Indian expert."

The parties returned to court the following week, and county counsel stated it was her understanding that mother had provided the Department with names of additional family members and potential tribes. The social worker stated that mother believed she was affiliated with "Choctaw, Blackfoot and Cherokee and Pomo and Paiute. Choctaw and Blackfoot have not been noticed so those will have to be noticed." County counsel acknowledged it was necessary to provide notices to the additional tribes and stated,

"We're going to need an ICWA expert on board just in case." The disposition hearing was continued until September 28.

On September 11, the Department filed another ICWA-030, which provided additional information about mother's family members. Notice was mailed to the three Cherokee tribes that previously had been notified, along with the four Blackfoot and Choctaw tribes listed in the then-current edition of the Federal Register. (77 Fed.Reg. 45816, 45837, 45839 (Aug. 1, 2012).) Later that month, the Department filed return receipts from all seven noticed tribes. Throughout this time, the Department continued to file responses from various tribes stating that the minors were not members of, or eligible for membership in, the tribes.

An ICWA expert submitted a report based on the expert's review of the three Department reports filed as of that date. The expert concluded that active efforts were being made to provide the family with a variety of reunification services (Cal. Rules of Court, rule 5.484(c)) and that the children should not be returned to their parents at that time because to do so would cause the children psychological, emotional, and physical harm.

At a hearing on September 28, the court and mother's counsel expressed doubt that ICWA applied, seeing as no tribe had indicated the minors were eligible for membership. But because not all tribes had responded to the Department's notices and fewer than 60 days had passed since notice had been provided (§ 224.3, subd. (e)(3)), the juvenile court indicated it would proceed as if ICWA applied. This meant that a qualified expert witness would testify under section 224.6, subdivision (b) whether continued custody of the children by the parents was likely to result in serious emotional and physical damage, and the court would take into consideration evidence about prevailing tribal social and cultural standards. Mother was willing to submit the ICWA expert's declaration in lieu of live testimony (§ 224.6, subds. (b)(1), (e)), but father was not. The court therefore continued the disposition hearing until October 2 when the ICWA expert was available to testify.

6

At the continued hearing, the ICWA expert testified that it was his understanding that neither the minors nor the parents were enrolled in an Indian tribe and that they "[we]ren't necessarily involved with or part of the Native community." He opined, consistent with his written report, that active efforts were being made to help the family reunify and that continued out-of-home placement for the minors was appropriate in light of the serious allegations that previously had been sustained. The witness had testified in more than 100 cases as an ICWA expert, and he stated, "I'd also like to comment on the fact that just the amount of work that went into trying to contact all these tribes, this is the first time I've seen so much extensive work with so many tribes trying to make contact with so many tribes. I've never seen that before." He acknowledged on cross-examination that different tribes have "different cultures and social rules," but he stated that incest and molestation were "not appropriate in any tribal sense or any family sense. So based on that alone I know all the tribes I've had contact with or had knowledge of in my work, that's not a part of our collective social standard or customs. So I feel comfortable speaking on that."

At the close of evidence, a discussion ensued whether the expert's testimony was sufficiently linked to a particular tribe. County counsel acknowledged that it would have been appropriate to provide expert testimony about the culture of a particular tribe if one tribe had been identified with ties to the family. She argued that, since no such tribe had been located, the Department had met its burden in this case. Counsel then requested the juvenile court to make appropriate findings, including those necessary in an Indian child custody proceeding, because of the "potential" applicability of ICWA. (§ 361, subd. (c)(6) [continued custody with parent or Indian custodian likely to result in serious emotional or physical damage to Indian child].) Mother's counsel responded, "I think we're just in agreement. I think there's a presumption there's always a tribe that is identified in these ICWA cases. I don't think ICWA law have [*sic*] these situations where—consider the situation where there's not a tribe to consider. But if there had been a tribe I think the expert has to be knowledgeable in that tribe's culture and social

7

aspects. If one is eventually identified then we'd argue [the expert] is not qualified," unless it was the tribe in which he was enrolled.

The juvenile court found that "the children may be Indian children, although I doubt it at this point. But, therefore, the Act may apply." The court found by clear and convincing evidence that continued custody of the children in their parents' home was likely to result in serious emotional or physical damage to the minors, and it adjudged all nine minors to be dependent children and ordered reunification services. Over the next month, the Department filed seven additional letters from Indian tribes stating that the minors were not considered to be Indian children.

## II.
### DISCUSSION

Mother (joined by father, who did not file a separate brief) argues that the dispositional orders must be reversed because the Department failed to provide proper notice to all relevant federally recognized Indian tribes. In her opening brief, she summarizes the importance of ICWA and the various duties it imposes on social services agencies, but she identifies only a few specific notification errors supposedly made in these proceedings. First, in an argument made for the first time on appeal and that contradicts her contentions below, mother claims that three tribes should have been, but were not, notified of the proceedings. Second, and again for the first time on appeal, she argues that there were deficiencies in some of the notices that were sent to the other tribes. Far from revealing ICWA error, our review of the record leads us to conclude that the Department and juvenile court did *more* than what was required to comply with the statute.

We begin with an overview of ICWA, which was enacted to " 'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.' " (*In re Karla C.* (2003) 113 Cal.App.4th 166, 173-174, quoting 25 U.S.C. § 1902.) Under ICWA, an " 'Indian child' " is a person who is a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4).) "ICWA protects the interests of

8

Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. [Citations.] If there is reason to believe a child that is the subject of a dependency proceeding is an Indian child, ICWA requires that the child's Indian tribe be notified of the proceeding and its right to intervene." (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396; see 25 U.S.C. § 1912(a).) These notice requirements are strictly construed because a tribe's right to intervene is meaningless if the tribe is unaware of the proceeding. (*Karla C.*, *supra*, at p. 174.)

Turning to her specific arguments, mother first claims that the Department erroneously neglected to notify one Paiute tribe and two Pomo tribes. At the time the notices were sent, the Federal Register recognized 28 Paiute tribes. (76 Fed.Reg. 30438, 30470 (May 25, 2011).) Although notices were sent to 27 of these tribes, mother contends that the Department failed to notify one of them—the Northwestern Band of Shoshoni Nation in Pocatello, Idaho. The Federal Register also recognized 24 Pomo tribes. (76 Fed.Reg. 30438, 30471 (May 25, 2011).) Although notices were sent to 22 of these tribes, mother contends that the Department failed to notify two of them—the Buena Vista Rancheria of Me-Wuk Indians in Sacramento and the California Valley Miwok Tribe in Stockton.

On the record before us, however, we cannot conclude that the Department was under an obligation to send notice to any of the Paiute or Pomo tribes and certainly not these specific ones. As discussed above, mother never identified Paiute or Pomo tribes on the ICWA-020 forms she completed, and there is nothing in the record showing that she ever claimed that she was a member of them. (*In re H.B.* (2008) 161 Cal.App.4th 115, 122 [knowledge of Indian connection is matter " 'wholly within the appealing parent's knowledge and disclosure is a matter entirely within the parent's present control' "].) We recognize that a disposition report filed on August 29 (weeks after the first ICWA-030 forms were filed) stated that mother had at some unspecified time mentioned possible affiliation with the two tribes. But the accuracy of this statement in

9

the report cannot be confirmed in the record and, given the evidence and course of proceedings that *are* contained in the record, it is clear that no error occurred.

The record shows that even though mother never identified Paiute or Pomo heritage on her ICWA-020 forms, the Department, for whatever reason, provided notice to almost all Paiute and Pomo tribes. At a hearing on August 31, mother's counsel stated that mother "informs me today that *the wrong tribes are being notified. She's saying—she's telling me it's a *different tribe*," and mother then indicated that the *Blackfoot* tribe should be notified. (Italics added.) Mother told the court that notices should be directed to tribes "in Oklahoma and Texas, all the—the eastern states," and she complained that California tribes had been notified even though "[w]e're not from California." In doing so, she failed to identify either the Pomo or Paiute tribes, disavowed any problem with the notices that had been sent to tribes in western states (including the three Paiute and Pomo tribes she identifies on appeal), and expressly disavowed membership in tribes located in California (such as the two Pomo tribes she identifies on appeal).

It is true that at a hearing about a week later, a social worker reported that she had met with the parents and that "she indicated they believe it's Choctaw, Blackfoot and Cherokee and Pomo and Paiute." But it is unclear from our review of the transcript who, exactly, indicated mother's possible Pomo and Paiute affiliation. Mother was silent on the issue at the hearing, and the social worker could easily have been repeating information from the file. When the juvenile court asked for further information, the social worker did not mention either tribe, but instead stated, "The notes I have from last Friday['s hearing] had said *Blackfoot, Cherokee and Sioux*, which they did not mention Sioux when I met with them. They said it was Choctaw." (Italics added.) We also note that when the Department sent out a second round of ICWA-030 notices that included the additional information from mother about her family members, they were sent to the same three Cherokee tribes previously noticed in addition to the new tribes identified by mother, presumably to provide the most complete information to all relevant Indian tribes. The fact that they were not directed to any Paiute and Pomo tribes suggests that there was no reason to notify them.

10

In her second argument, mother contends that a few of the notices sent to the dozens of Paiute and Pomo tribes that were given notice were deficient for technical reasons.[5] She notes that 10 Paiute and Pomo tribes failed to respond to the notices that were sent to them, and she argues their notices were insufficient because they were addressed to "ICWA Representative" or "ICWA Coordinator" instead of the specific contact persons listed in the Federal Register. For example, a notice was sent to the "ICWA Representative" at the Lone Pine Paiute Shoshone Reservation in Lone Pine instead of "Kathy Bancroft, Enrollment Committee Chairperson." (76 Fed.Reg. 30438, 30469-30474 (May 25, 2011).) We recognize that there is support for the argument that ICWA notices must be sent to the designated tribal representative named in the Federal Register. (§ 224.2, subd. (a)(2) [notice shall be provided to tribal chairperson or designated agent for service]; *In re Alice M.* (2008) 161 Cal.App.4th 1189, 1201 [improper ICWA notice where designated person not noticed and tribe failed to respond; fact that social services department received signed return receipts insufficient to demonstrate actual notice]; but cf. *In re N.M.* (2008) 161 Cal.App.4th 253, 268 [substantial evidence of proper notice even though notices addressed to " 'ICWA Representative' " instead of designated representative; mandating "literal compliance solely by reference to the names and addresses listed in the last published Federal Register would exalt form over substance"].) But we need not decide the issue in this case because, again, we cannot conclude on the record before us that the Department had an obligation to send notices to these tribes in the first place. Accordingly, we decline to

---

[5] Mother also states in her opening brief that Cherokee tribes received defective notices, but she does not specify any particular deficiencies.

11

reverse the dispositional orders or require the Department to re-serve these tribes with notices directed to named representatives.[6]

Mother also argues that the response received from one of the tribes, the Redwood Valley Rancheria in Redwood Valley, was insufficient evidence that the tribe received actual notice because the response was sent to the Department on a plain piece of paper that was unsigned. We decline mother's invitation to deem this an unacceptable response. (*In re William K.* (2008) 161 Cal.App.4th 1, 12 [social worker under no duty to elicit particular response from noticed tribe].)

Finally, we cannot conceive how reversing the dispositional orders would serve any legitimate purpose because the juvenile court proceeded *as if ICWA applied*. Mother claims that "it was important for a proper determination in this case that the Indian expert be knowledgeable in tribal customs as they pertain to family organization and childrearing practices of the Paiute, Pomo, or Cherokee tribes, and have extensive knowledge of prevailing social and cultural standards and childrearing practices within any of those tribes," and suggests the outcome might have been different if an expert familiar with a particular tribe affiliated with her family had been called to testify. This argument fails for at least two reasons. First, mother does not challenge the expert's testimony that incest and molestation (the reasons for Department intervention) are unacceptable in any tribe, and she cannot claim that the juvenile court failed to consider this under section 224.6. Second, she does not affirmatively claim on appeal that she has Paiute or Pomo heritage. In short, even if we were to assume that there were errors in some of the notices, we would conclude that they were harmless. (*In re N.E.* (2008)

---

[6] Furthermore, it would be pointless to require notices to be re-sent to a couple of the tribes. When the notices were mailed, the Federal Register listed a specific ICWA contact person (Cynthia Jefferson) for the Big Valley Rancheria in Lakeport. (76 Fed.Reg. 30438, 30471 (May 25, 2011).) But the most recent Federal Register simply lists "ICWA" for that tribe, with no specific name, consistent with the original notice. (77 Fed.Reg. 45816, 45849 (Aug. 1, 2012).) And, according to the Federal Register published in August 2012, there is no longer a recognized government of the California Valley Miwok Tribe, and thus there is currently no ICWA representative listed to whom notice could be directed. (77 Fed.Reg. 45816, 45849 (Aug. 1, 2012).)

12

160 Cal.App.4th 766, 771 [no prejudice where appealing party does not suggest in his appellate brief that he has Indian heritage]; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431 [no prejudice in absence of appealing parent's affirmative representation of Indian heritage].)

We are sympathetic to an argument made by one of the minor's attorneys at the close of the disposition hearing that "[t]his case is sort of like a poster child for ICWA abuse. I think most of the tribal representatives that I've dealt with feel like they would really rather see ICWA saying there must be some relationship before ICWA comes into play. But the current state of the law—I think the department did a remarkable job of trying to find somebody. And so I—I support what they've done. And I think they've met the requirements." We agree that the Department met its legal obligations under ICWA, and we commend both the Department and the juvenile court for the way they handled this aspect of the proceedings. (*In re N.M.*, *supra*, 161 Cal.App.4th at p. 269 [social services agency "made heroic efforts to give ICWA notice"].)

### III.
### DISPOSITION

Appeal A135645 is dismissed. The dispositional orders appealed from in A136929 are affirmed.

_____
Humes, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.